# EXHIBIT A

# QBE® Insurance Corporation
A Stock Company



*The Solution* for Management Liability

---

**Home Office:**

c/o CT Corporation System
116 Pine Street, Suite 320
Harrisburg, Pennsylvania 17101

**Administrative Office:**

Wall Street Plaza
88 Pine Street
New York, New York 10005
1-877-772-6771

**EXHIBIT**

**8**

QBE and the links logo are registered service marks of QBE Insurance Group Limited.

QBBP-3033 (05-14)

**This policy consists of:**        Declarations
                                    One or more coverage parts.
                                    A coverage part consists of:
                                    — One or more coverage forms
                                    — Applicable forms and endorsements

**QBE Insurance Corporation**

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Robert V. James                    Jose Ramon Gonzalez, Jr.
President                          Secretary

POLICY NUMBER: QPL0057435

QBBP-3010 (09-14)



*The Solution*

**General Terms and Conditions Declarations**

**QBE Insurance Corporation**
Wall Street Plaza, 88 Pine Street, New York, New York 10005
Home Office:  c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania  17101

**THE LIABILITY COVERAGE PARTS PROVIDE CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.  THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS.  PLEASE READ THIS POLICY CAREFULLY.**

**Item 1**: Parent Company:     Clyde Companies, Inc.

Mailing Address:     730 North 1500 West
Orem, UT 84057

**Item 2**: Policy Period     From: August 21, 2017 To: August 21, 2018
At 12:01 A.M. Standard Time at the mailing address stated in Item 1

**Item 3**: Limit of Liability     $10,000,000 Combined Maximum Aggregate Limit of Liability for Liability Coverage Part

**Item 4**: Coverage Parts:     Directors & Officers and Entity Liability
Employment Practices Liability
Fiduciary Liability

**Item 5**:     A. Notice to Insurer of a Claim or circumstance:          B. All Other Notices to Insurer:

QBE Insurance Corporation                     QBE Insurance Corporation
Attn: The Claims Manager                      Attn: Underwriting
Wall Street Plaza                             Wall Street Plaza
88 Pine Street, 18th Floor                    88 Pine Street, 18th Floor
New York, New York 10005                      New York, New York 10005
Telephone: (877) 772-6771                     Telephone: (877) 772-6771
Email: professional.liability.claims@us.qbe.com     Email: MLPLadmin@us.qbe.com

**Item 6**: Extended Reporting Period
Premium:  150% of annual premium
Length:     One Year

**Item 7**: Premium: $84,785

In witness whereof, the Insurer has caused this Policy to be executed, but it shall not be valid unless also signed by a duly authorized representative of the Insurer.

QBE 000409

In consideration of the payment of the premium, the Insurer and the **Insureds** agree as follows:

**I.    PREAMBLE**

The insurance coverages offered in this Policy are part of a portfolio of insurance coverages, consisting of this General Terms and Conditions ("GTC") and any individual **Liability Coverage Parts** and **Non-Liability Coverage Parts** purchased, as stated in Item 4 of the Declarations of this GTC. The type of coverage provided by each of the **Liability Coverage Parts** and **Non-Liability Coverage Parts** are identified in each particular Coverage Part. Unless expressly stated to the contrary, the terms, conditions and limitations in this GTC apply to the entire Policy, whereas the terms, conditions and limitations of each individual Coverage Part only apply to that particular Coverage Part. In the event of a conflict between any terms, conditions or limitations of the GTC and any terms, conditions and limitations of any individual Coverage Part, the terms, conditions and limitations of the individual Coverage Part shall control.

**II.    EXCLUSIONS**

No coverage shall be provided under any **Liability Coverage Part** for **Loss** on account of that portion of a **Claim**:

A.  Bodily Injury/Property Damage - for bodily injury, mental anguish, emotional distress, humiliation, sickness, disease or death of any person or damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is damaged or destroyed;

B.  Conduct - based upon, arising out of or resulting from any deliberate fraud, deliberate criminal act or deliberate violation of any statute or regulation, or any illegal profit or remuneration, by an **Insured**, established by a final, non-appealable adjudication adverse to such **Insured** in any underlying action, and the Insurer shall not utilize a declaratory action or proceeding brought by or against the Insurer to establish such final, non-appealable adjudication;

C.  ERISA - for any violation of the responsibilities, obligations or duties imposed by **ERISA** or for any functions identified in **ERISA** Section 3(21)(A) as not being the functions of a fiduciary, and commonly referred to as "settlor" functions;

D.  Pending or Prior Proceedings - based upon, arising out of or resulting from an action, proceeding or **Claim** commenced against an **Insured** pending on or prior to the Pending or Prior Proceedings Date stated in the Declarations of each applicable **Liability Coverage Part**;

E.  Pollution - based upon, arising out of or resulting from any:

   1.  discharge, emission, release, dispersal or escape of any **Pollutants** or any threat thereof;

   2.  treatment, removal or disposal of any **Pollutants**; or

   3.  regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**,

   including any **Claim** for financial loss to a **Company**, its securityholders or its creditors based upon, arising from or in consequence of any matter described in paragraphs 1, 2, or 3 above;

F.  Prior Notice - based upon, arising out of or resulting from any claim reported, or any circumstance reported and accepted, under the insurance policy (including any policies of which such policy is a renewal policy) replaced by this Policy; and

G.  Wage and Hour - based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by any law governing wage, hour or payroll, including the Fair Labor Standards Act;

Exclusions D and F above shall not apply where this Policy is a renewal of a policy issued by the Insurer to the **Parent Company**.

With respect to all Policy exclusions, no conduct or knowledge of any **Insured** shall be imputed to any other **Insured Person**, and solely with respect to Exclusion B, only the conduct or knowledge of any past, present or future chief executive officer or chief financial officer of a **Company** shall be imputed to such **Company** and its **Subsidiaries**.

**III.    RETENTION OR DEDUCTIBLE**

A.  Any Retention or Deductible applicable to any Coverage Part shall apply as set forth in each Coverage Part and in the amount(s) stated in the Declarations of each Coverage Part. If different parts of a single **Claim** are

QBE 000410

subject to different Retentions or Deductibles, then the total amount of **Loss** applied to the applicable Retentions or Deductibles shall not exceed the largest applicable Retention or Deductible.

B. No Retention shall apply to any **Loss** for which an **Insured Person** is not indemnified by a **Company** because of such **Company's Financial Impairment**.

## IV.  LIMIT OF LIABILITY

A. The Combined Maximum Aggregate Limit of Liability, stated in Item 3 of the Declarations of this GTC, represents the maximum amount payable under all **Liability Coverage Parts** during the **Policy Period** for all **Liability Coverage Parts** combined.

B. The Limit of Liability, stated in Item 2 of the Declarations of each **Liability Coverage Part**, represents the maximum amount payable under each **Liability Coverage Part** during the **Policy Period** for any one **Claim** and in the aggregate as set forth in each such **Liability Coverage Part**.

C. **Defense Costs** are part of, and not in addition to, the Limit of Liability of each **Liability Coverage Part**.

D. The remaining portion of each of the limits of liability described above shall be the limits of liability available during any Extended Reporting Period applicable to any Coverage Part.

## V.  REPORTING

A. Notice of any **Claim** under any **Liability Coverage Part** is considered timely when reported to the Insurer as soon as practicable after the **Parent Company's** chief executive officer or chief financial officer first becomes aware of such **Claim**. The Insurer shall not assert that notice of a **Claim** was untimely unless the Insurer is materially prejudiced by the untimely notice. However, in no event shall any notice be provided later than:

   1. if the applicable **Liability Coverage Part** expires (or is otherwise terminated) without being renewed with the Insurer, 60 days after the effective date of such expiration or termination; or

   2. the expiration date of the Extended Reporting Period, if applicable.

B. Notice requirements involving any **Non-Liability Coverage Part** shall be in accordance with the reporting requirements set forth in such **Non-Liability Coverage Part**.

C. Notice of any circumstance which could give rise to a **Claim** under any **Liability Coverage Part** is optional. If an **Insured** elects to report any circumstance which could give rise to a **Claim**:

   1. such notice shall include information regarding the nature of any **Wrongful Acts** or alleged or potential damages and the names of any actual or potential defendants; and

   2. any **Claim** that may subsequently arise out of a reported circumstance shall be deemed to have been first made during the **Policy Period** in which such circumstance was first reported.

## VI.  DEFENSE AND SETTLEMENT

A. With respect to any **Claim** under any **Liability Coverage Part**, the Insurer shall have the right and duty to defend any **Claim**, unless otherwise specifically stated in a particular **Liability Coverage Part**. The Insurer shall have such right and duty to defend even if any of the allegations in such **Claim** are groundless, false or fraudulent. Any such duty to defend shall cease upon exhaustion of the applicable Limit of Liability.

B. With respect to any **Claim** under any **Liability Coverage Part**:

   1. the **Insured** shall:

      (a) not agree to any settlement, stipulate to any judgment, incur any **Defense Costs**, admit any liability or assume any contractual obligation, without the Insurer's prior written consent, provided that, unless otherwise stated in a particular **Liability Coverage Part**, the **Insured** may settle any **Claim**, without the Insurer's prior written consent, where the amount of such settlement, including **Defense Costs**, does not exceed the applicable Retention or Deductible;

      (b) not do anything that could prejudice the Insurer's position or its potential or actual rights of recovery; and

      (c) agree to provide the Insurer with all information, assistance and cooperation which the Insurer may reasonably require,

   provided that the failure of any **Insured** to comply with any of the requirements in paragraphs (a) - (c) above, shall not impair the rights of any **Insured Person** under this Policy; and

   2. the Insurer:

QBE 000411

(a) may make any investigation it deems reasonably necessary and may, with the consent of the **Insureds**, make any settlement of any **Claim** it deems appropriate; and

(b) shall not be liable for any such settlement, stipulation, incurred **Defense Costs**, admission or assumed obligation to which it has not given its prior written consent, and the Insurer shall not unreasonably withhold such consent.

## VII.   ALLOCATION

If in any **Claim**, the **Insureds** who are afforded coverage for a **Claim** incur **Loss** that is covered by this Policy and loss that is not covered by this Policy because such **Claim** includes both covered and uncovered matters, 100% of **Defense Costs** incurred by such **Insured** shall be covered **Loss**, and all loss other than **Defense Costs** shall be allocated between covered **Loss** and uncovered loss based upon the relative legal exposures of the parties to such matters.

## VIII.   TREATMENT OF RELATED CLAIMS

All **Related Claims** shall be deemed a single **Claim** first made during the policy period in which the earliest of such **Related Claims** was either first made or deemed to have been first made in accordance with Section V. REPORTING above.

## IX.   SUBROGATION

A. In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery, and the **Insureds** shall take all reasonable actions to secure and preserve the Insurer's subrogation rights.

B. In no event shall the Insurer exercise any subrogation right against an **Insured Person**.  In any subrogation action against a **Company**, it is agreed that each **Company** agrees to fulfill any indemnification obligations to the fullest extent permitted by law and any contract or agreement providing an indemnification obligation exceeding any such law.

C. If the Insurer recovers, either through subrogation or recoupment, any portion of an amount paid under this Policy, the Insurer shall reinstate the applicable limit of liability with any amounts recovered up to such amount paid, less any costs incurred by the Insurer in its recovery efforts.

## X.   EXTENDED REPORTING PERIOD

With respect to all **Liability Coverage Parts**:

A. If this Policy does not renew, or terminates other than for non-payment of premium, the **Insureds** shall have the right to purchase an ERP for the premium and time period stated in Item 6 of the Declarations. In the event of the non-renewal or termination of one or more **Liability Coverage Parts** of this Policy, the **Insureds** may purchase an ERP solely as respects the **Liability Coverage Part(s)** that has been non-renewed or terminated.

B. The right to an ERP shall lapse unless written notice of election to purchase such ERP, together with payment of the specified premium, is received by the Insurer within 30 days after the effective date of non-renewal or termination of the Policy. In the event the **Parent Company** elects not to purchase an ERP and an individual **Insured** or group of **Insureds** elects to purchase such ERP, such ERP shall only apply to **Claims** against such **Insured** or group of **Insureds**.

C. The premium for the ERP shall be deemed fully earned at the inception of the ERP.

D. Any ERP purchased shall become part of the **Policy Period**, extending such **Policy Period** to the expiration of the time period stated in Item 6 of the Declarations, but only with respect to **Loss** on account of a **Claim** for a **Wrongful Act** taking place before the effective date of non-renewal or termination.

## XI.   CHANGES IN EXPOSURE

A. New Companies and Old Companies

This Policy's treatment of **Subsidiaries** shall be as stated below and as supplemented by any individual Coverage Part.

Any **Insured** of a **Subsidiary**:

1. acquired before or during the **Policy Period** is eligible for coverage under any:

(a) **Liability Coverage Part**, but only for **Loss** on account of a **Claim** for a **Wrongful Act** which occurs after the date of such acquisition; and

QBE 000412

(b) **Non-Liability Coverage Part**, but only after the effective date of such acquisition, and with respect to the Crime Coverage Part, subject to Section VIII. Other Insurance of such Coverage Part.

2. ceasing to be a **Subsidiary** before or during the **Policy Period** is eligible for coverage under any:

(a) **Liability Coverage Part**, but only for **Loss** on account of a **Claim** for a **Wrongful Act** which occurs while such entity was a **Subsidiary**; and

(b) **Non-Liability Coverage Part**, as provided in such **Non-Liability Coverage Part**, but such **Subsidiary** and its **Insureds** shall cease to be **Insureds** under such **Non-Liability Coverage Part** as of the date of such cessation.

B. Acquisition of the **Parent Company**

In the event of a **Change in Control** of the **Parent Company** during the **Policy Period**:

1. any **Liability Coverage Part** shall remain in force until the expiration of the **Policy Period**, but only for any **Claim** for a **Wrongful Act** which occurs prior to such acquisition;

2. the entire premium for this Policy shall be deemed fully earned as of the effective date of such **Change in Control**; and

3. the **Parent Company** shall be entitled to receive a quote for an extension of the **Liability Coverage Parts** ("Run-Off Coverage") solely for **Claims** for **Wrongful Acts** which occurred prior to a **Change in Control**. Coverage offered pursuant to such quote shall be subject to additional or different terms and conditions and payment of additional premium. Any Run-Off Coverage purchased shall replace any Extended Reporting Period provided under Section X. EXTENDED REPORTING PERIOD.

## XII.  NOTICE

A. All notices to the Insurer under this Policy of any event, loss, **Claim** or circumstances which could give rise to a **Claim** shall be given in writing to the address listed in Item 5A of the Declarations, and any such notice shall be deemed notice under the Policy in its entirety.

B. All other notices to the Insurer under this Policy shall be given in writing to the address listed in Item 5B of the Declarations.

C. Any notice under this Policy shall be effective on the date of mailing or receipt by the Insurer, whichever is earlier.

## XIII.  TERMINATION OF POLICY

This Policy shall terminate at the earliest of:

A. 20 days after receipt by the **Parent Company** of written notice from the Insurer of termination for non-payment of premium;

B. expiration of the **Policy Period**; or

C. surrender of the Policy to the Insurer by the **Parent Company** or notice to the Insurer by the **Parent Company** stating when such cancellation will take effect, and in either case any returned premium shall be computed on a pro rata basis.

## XIV.  REPRESENTATIONS, SEVERABILITY AND NON-RESCINDABLE COVERAGE

A. In issuing this Policy, the Insurer has relied upon the information and representations in the **Application** as being true and accurate, and the **Application** is the basis for, and considered incorporated into, this Policy.

B. The **Application** shall be construed as a separate request for coverage by each **Insured**, without any knowledge possessed by an **Insured** being imputed to any other **Insured Person**.

C. If the **Application** contains any misrepresentation made with the actual intent to deceive or which, for reasons other than simple negligence or oversight, materially affect the Insurer's acceptance of the risk or the hazard assumed, the Insurer shall not be liable for **Loss** on account of any **Claim** based upon, arising out of or resulting from either of such misrepresentations:

1. with respect to any **Insured Person** who had actual knowledge of any misrepresentation described in paragraph C above, and the Insurer can demonstrate that with such actual knowledge, such **Insured Person** reasonably believed that a **Claim** would arise from such misrepresentation;

2. with respect to any **Company**, if the **Insured Person** described in paragraph 1 above is a past or present chief executive officer or chief financial officer of the **Parent Company**.

QBE 000413

D. The Insurer shall not be entitled under any circumstances to void or rescind this Policy with respect to any **Insured**.

## XV. EFFECT OF BANKRUPTCY

Bankruptcy or insolvency of any **Insured** shall not relieve the Insurer of its obligations nor deprive the Insurer of its rights or defenses under this Policy.

## XVI. WORLDWIDE TERRITORY

This Policy shall apply anywhere in the world, and any reference to laws, however described, shall include all U.S. federal, state and local statutory laws, all amendments to and rules and regulations promulgated under any such laws, common law, and any equivalent body of law anywhere in the world, unless specifically stated to the contrary.

## XVII. ROLE OF THE PARENT COMPANY

The **Parent Company** shall act on behalf of each **Insured** with respect to paying premiums, receiving any return premiums, agreeing to endorsements to this Policy and the giving or receiving of any notice provided for in this Policy (except notices of a **Claim** or circumstance which could give rise to a **Claim** or notice to apply for an ERP).

## XVIII. VALUATION AND FOREIGN CURRENCY

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If any element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States of America dollars at the exchange rate published in The Wall Street Journal on the date the element of **Loss** is due.

## XIX. ALTERATION, ASSIGNMENT AND HEADINGS

A. Any change in or modification of this Policy or assignment of interest under this Policy must be agreed to in writing by the Insurer.

B. The descriptions and headings and sub-headings of this Policy are solely for convenience, and form no part of the terms, conditions and limitations of coverage.

## XX. ESTATES, HEIRS, LEGAL REPRESENTATIVES, ASSIGNS, SPOUSES AND DOMESTIC PARTNERS

With respect to any **Liability Coverage Part**, **Insured Person** shall include:

A. the estate, heirs, legal representatives or assigns of any **Executive**, if such **Executive** is deceased, legally incompetent, insolvent or bankrupt; and

B. the lawful spouse or domestic partner of any **Executive** solely by reason of such spouse's or domestic partner's: 1. status as such; or 2. ownership interest in property which a claimant seeks as recovery for an alleged **Wrongful Act** of such **Executive**,

provided that no coverage shall apply with respect to loss arising from an act, error or omission by any estate, heir, legal representative, assign, spouse or domestic partner of an **Insured Person**.

## XXI. TRADE SANCTIONS

This insurance coverage does not apply to the extent that trade or economic sanctions of any country prohibit the insurer or any member of the insurer's group from providing insurance coverage.

## XXII. GLOSSARY

The following terms shall have the meaning ascribed to such terms in each applicable Coverage Part: **Claim**, **Defense Costs**, **Insured**, **Insured Person**, **Loss** and **Wrongful Act**.

A. **Application** means where provided to the Insurer, the application and any accompanying documentation submitted to the Insurer for this Policy or any documentation submitted to the Insurer in connection with the underwriting of this Policy.

B. **Change in Control** means:

1. the **Parent Company's** merger with, or acquisition by, another entity or the acquisition of all or substantially all of its assets by another entity, such that the **Parent Company** is not the surviving entity; or

2. when a person or entity or group of persons or entities acting in concert, acquires securities or voting rights which result in ownership or voting control by such person(s) or entity(ies) of more than 50% of the

QBE 000414

outstanding securities or voting rights representing the present right to vote for or appoint directors or **Managers** of the **Parent Company**.

C. **Company** means the **Parent Company** and any **Subsidiary**, any foundation, political action committee or charitable trust controlled or sponsored by the **Parent Company** or any **Subsidiary**, and the **Parent Company** or any **Subsidiary** in its capacity as a debtor in possession under United States bankruptcy law.

D. **Employee** means any natural person whose labor or service was, is or will be engaged and directed by a **Company**, including a part-time, seasonal, leased and temporary employee, intern or volunteer. **Employee** does not include an independent contractor.

E. **ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA")).

F. **Executive** means any natural person who was, now is or shall become:

1. a duly elected or appointed director, officer, **Manager**, trustee, regent, governor, risk manager, comptroller or in-house general counsel of any **Company** organized in the United States of America, or in a functionally equivalent or comparable role to any of the foregoing; or

2. a holder of a functionally equivalent position or comparable role to those described in paragraph 1 above in a **Company** that is organized in a jurisdiction other than the United States of America, including any position on an advisory board or committee.

G. **Extradition** means any formal process by which an **Insured** located in any country is or is sought to be surrendered to any other country for trial or otherwise to answer any criminal accusation, including the execution of an arrest warrant where such execution is an element of such process.

H. **Financial Impairment** means the status of a **Company** resulting from: 1. the appointment by a state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate such **Company**; or 2. such **Company** becoming a debtor in possession under United States bankruptcy law.

I. **Liability Coverage Part** means any Coverage Part identified in this Policy as a "Liability Coverage Part" within the heading to such Coverage Part or providing third party liability coverage in such Coverage Part.

J. **Manager** means any natural person, who was, now is, or shall become, a manager, member of the Board of Managers or equivalent executive of a **Company** that is a limited liability company.

K. **Non-Liability Coverage Part** means any Coverage Part or insuring clause in this Policy that does not provide any third party liability coverage.

L. **Parent Company** means the entity named in Item 1 of the Declarations.

M. **Policy Period** means the period of time stated in Item 2 of the Declarations of this GTC (subject to any termination in accordance with Section XIII. TERMINATION OF POLICY) and the ERP, if applicable.

N. **Pollutants** means any solid, liquid, gaseous or thermal irritants or contaminants, including smoke, soot, vapor, fumes, acids, chemicals, alkalis, asbestos, asbestos products or waste. Waste includes materials to be reconditioned, recycled or reclaimed.

O. **Related Claims** means all **Claims** based upon, arising out of or resulting from the same or related, or having a common nexus of, facts, circumstances or **Wrongful Acts**.

P. **Subsidiary** means:

1. any entity while more than 50% of the outstanding securities or other equity ownership, representing the present right to vote for election of, or to appoint, directors, **Managers**, or the foreign equivalent of any such directors or **Managers** of such entity, are owned or controlled by the **Parent Company** directly or indirectly through one or more **Subsidiaries**; or

2. any entity while the **Parent Company** has the right, pursuant to either written contract or the bylaws, charter, operating agreement or similar documents of a **Company**, to elect or appoint a majority of the Board of Directors of a corporation or **Managers**.

POLICY NUMBER: QPL0057435

QBBP-3006 (05-14)



***The Solution** for Directors & Officers and Entity Liability Coverage Part Declarations*

**QBE Insurance Corporation**
Wall Street Plaza, 88 Pine Street, New York, New York 10005
Home Office:  c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania  17101

**THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.  THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

**Item 1**:     Parent Company:     Clyde Companies, Inc.

**Item 2**:     A.  Limit of Liability

$10,000,000 per Claim
$10,000,000 in the aggregate

B.  Securityholder Derivative Demand Investigation Limit: $250,000

**Item 3**:     Additional Limit for Non-Indemnifiable Loss: $500,000

**Item 4**:     Retention:

A.  Insuring Clause B: $50,000 per Claim
B.  Insuring Clause C: $50,000 per Claim

**Item 5**:     Pending or Prior Proceedings Date: July 15, 2003

QBE 000416



*The Solution for Private Company Directors & Officers and Entity Liability Coverage Part*

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the **Insureds** agree as follows:

## I.    INSURING CLAUSE

A.    Side A - Non-Indemnifiable Loss Coverage for Insured Persons

The Insurer shall pay, on behalf of an **Insured Person**, **Loss** on account of a **Claim** first made during the **Policy Period**, to the extent that such **Loss** has not been paid or indemnified by any **Company**.

B.    Side B - Corporate Reimbursement Coverage for Indemnification of Insured Persons

The Insurer shall pay, on behalf of a **Company**, **Loss** on account of a **Claim** first made during the **Policy Period** to the extent the **Company** pays or indemnifies an **Insured Person** for such **Loss**.

C.    Side C - Entity Coverages

The Insurer shall pay, on behalf of a **Company**, **Loss** on account of a **Claim**, and **Defense Costs** on account of a **Securityholder Derivative Demand Investigation**, first made during the **Policy Period**.

## II.    EXCLUSIONS

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for **Loss** on account of that portion of a **Claim**:

A.    Insured v. Insured - brought by, or on behalf of:

1.    a **Company** against another **Company**;

2.    a **Company** or **Outside Entity** against an **Insured Person**;

3.    an **Insured Person**, in any capacity, against an **Insured**,

provided that:

(a)    Exclusion A2 above shall not apply to a **Claim** brought: (i) outside the United States of America, Canada or their territories or possessions; (ii) while the **Parent Company** or **Outside Entity** is in **Financial Impairment**; (iii) as a securityholder derivative action; or (iv) while an **Insured Person** is no longer serving in his capacity as such; and

(b)    Exclusion A3 above shall not apply to any **Claim**: (i) for employment-related **Wrongful Acts** against an **Insured Person**; (ii) for contribution or indemnity; (iii) brought by an **Insured Person** who has ceased serving in his capacity as such for at least 1 year; or (iv) brought by, on behalf of or with the participation of a whistleblower;

B.    Publicly Traded Securities - based upon, arising out of or resulting from any public offering of, or purchase or sale of, equity or debt securities issued by any **Company** or **Outside Entity**, provided that this Exclusion B shall not apply to any **Claim** based upon, arising out of or resulting from the **Company's**: 1. securities that are not required to be registered; 2. failure to undertake or complete an initial public offering or sale of its securities; or 3. preparation for any public offering, including any "road show" presentation to potential investors or other similar presentation;

Exclusions C - I below shall only apply to Insuring Clause C, Side C - Entity Coverages:

C.    Antitrust - based upon, arising out of or resulting from anti-trust, price fixing or discrimination, restraint of trade, monopolization, unfair trade practices, predatory pricing or false advertising;

D.    Contract - based upon, arising out of or resulting from any liability in connection with any contract or agreement to which a **Company** is a party, provided that this Exclusion D shall not apply to the extent that such **Company** would have been liable in the absence of such contract or agreement;

E.    Employment Practices - based upon, arising out of or resulting from any employment-related **Wrongful Act**;

F.    Intellectual Property - based upon, arising out of or resulting from any infringement of copyright, patent, trademark, trade dress, trade name or service mark or any misappropriation of ideas, trade secrets or other intellectual property rights;

QBE 000417

G.  Personal Injury - based upon, arising out of or resulting from any defamation (including libel and slander), disparagement, wrongful entry or eviction, invasion of privacy, false arrest, false imprisonment, assault, battery, loss of consortium, malicious use or abuse of process or malicious prosecution.

H.  Professional Services - based upon, arising out of or resulting from the performance of or failure to perform **Professional Services**; and

I.  Third Party Discrimination or Harassment - based upon, arising out of or resulting from any discrimination against, or harassment of, any third party.

With respect to this Coverage Part, the following exceptions shall apply to Section II. EXCLUSIONS of the GTC:

1.  Exclusion A. Bodily Injury/Property Damage shall not apply to any **Claim** under Insuring Clause A; and

2.  Exclusion E. Pollution shall not apply to any **Claim**: (a) under Insuring Clause A; or (b) brought by a securityholder of a **Company** against an **Insured Person**.

## III.  RETENTION

No retention shall apply to any **Claim** under Insuring Clause A or to any **Securityholder Derivative Demand Investigation**.

## IV.  LIMIT OF LIABILITY

A.  The Securityholder Derivative Demand Investigation Limit stated in Item 2B of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the **Policy Period** for **Defense Costs** on account of all **Securityholder Derivative Demand Investigations**, which amount shall be part of, and not in addition to, the Limit of Liability stated in Item 2A of such Declarations.

B.  The Additional Limit for Non-Indemnifiable Loss stated in Item 3 of the Declarations of this Coverage Part represents an additional limit of liability available solely to an **Executive** or natural person **General Partner** for **Loss** on account of a **Claim** covered under Insuring Clause A. This additional limit of liability shall be in addition to and not part of, and excess of any other insurance written specifically as excess of, the Limit of Liability stated in Item 2A of such Declarations.

## V.  ADVANCEMENT

A.  If a **Company** fails to respond to an **Insured Person's** request for indemnification within 60 days of the **Insured Person's** request to the **Company** for such indemnification, then upon the reporting of the **Claim**, the Insurer shall advance **Defense Costs** and any other incurred **Loss** until such time that the **Company** accepts the **Insured's** request for indemnification or the Limit of Liability set forth in Item 2A of the Declarations of this Coverage Part has been exhausted, whichever occurs first. In any other **Claim**, the Insurer shall advance **Defense Costs** on a current basis, but no later than 60 days after receipt of the legal bills and any supporting documentation.

B.  If it is determined by a final adjudication that any advanced **Defense Costs** are not covered under this Coverage Part, the **Insureds**, severally according to their respective interests, shall repay such uncovered **Defense Costs** to the Insurer, provided that nothing in this paragraph B shall limit the final non-appealable adjudication requirement in Exclusion B. Conduct of Section II. EXCLUSIONS of the GTC. If the Insurer recovers any portion of an amount paid under this Coverage Part, the Insurer shall reinstate the applicable limit of liability with any amounts recovered up to such amount paid, less any costs incurred by the Insurer in its recovery efforts.

## VI.  REPORTING

Notice of a **Securityholder Derivative Demand Investigation** is optional, but only **Loss** incurred after such **Securityholder Derivative Demand Investigation** is reported is eligible for coverage under this Coverage Part. If an **Insured** elects to report any **Securityholder Derivative Demand Investigation**, any **Claim** that may subsequently arise out of any reported **Securityholder Derivative Demand Investigation** shall be deemed to have been first made during the **Policy Period** in which such investigation was first reported.

## VII.  OTHER INSURANCE

A.  With the exception of insurance written specifically as excess of the Limit of Liability of this Coverage Part, this Coverage Part shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for **Loss** for which this Coverage Part also provides coverage, provided that any payment by an **Insured** of a retention or deductible under any such other insurance shall reduce the applicable Retention under this Coverage Part by the amount of such payment which would otherwise have been **Loss** under this Coverage Part.

QBE 000418

B. This Coverage Part shall also be excess of and shall not contribute with any indemnity provided, and any valid and collectible insurance maintained, by an **Outside Entity** for an **Insured Person** serving in his capacity as such for the **Outside Entity**.

C. Any personal umbrella excess liability insurance, independent directors liability insurance or any other similar personal liability insurance available to an **Insured** shall be specifically excess of this Coverage Part.

**VIII.  PRIORITY OF PAYMENTS**

A. In the event that **Loss** under Insuring Clause A and any other **Loss** are concurrently due under this Coverage Part, then the **Loss** under Insuring Clause A shall be paid first. In all other instances, the Insurer may pay **Loss** as it becomes due under this Coverage Part without regard to the potential for other future payment obligations under this Coverage Part.

B. The coverage provided by this Coverage Part is intended first and foremost for the benefit and protection of **Insured Persons**. In the event a liquidation or reorganization proceeding is commenced by or against a **Company** pursuant to United States bankruptcy law:

   1. the **Insureds** hereby agree not to oppose or object to any efforts by the Insurer, the **Company** or an **Insured** to obtain relief from any stay or injunction issued in such proceeding; and

   2. the Insurer shall first pay **Loss** on account of a **Claim** for a **Wrongful Act** occurring prior to the date such liquidation or reorganization proceeding commences, and then pay **Loss** in connection with a **Claim** for a **Wrongful Act** occurring after the date such liquidation or reorganization proceeding commences.

**IX.  SECURITIES OFFERING**

If during the **Policy Period**, a **Company** intends a public offering of securities under the Securities Act of 1933 and gives written notice to the Insurer within 30 days of the effective date of the Registration Statement for such offering, together with any additional information requested by the Insurer, the Insurer shall provide the **Company** with a quote for coverage with respect to such offering. Coverage offered pursuant to this quote shall include coverage for **Wrongful Acts** occurring in the course of any "road show" presentation to potential investors or other similar presentation and shall be subject to additional or different terms and conditions and payment of additional premium.

**X.  GLOSSARY**

A. **Claim** means:

   1. with respect to Insuring Clauses A and B, any investigation, evidenced by any written document, including a subpoena, target letter or search warrant, against an **Insured Person** for a **Wrongful Act**; and

   2. with respect to Insuring Clauses A, B and C:

      (a) a written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, mediation, waiving or tolling of a statute of limitations or **Extradition**;

      (b) a civil or criminal proceeding, evidenced by: (i) the service of a complaint or similar pleading in a civil proceeding; or (ii) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; and

      (c) a formal administrative or regulatory proceeding, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation,

   against an **Insured** for a **Wrongful Act**, including any appeal therefrom.

The time when a **Claim** shall be deemed first made for the purposes of this Coverage Part shall be the date on which the **Claim** is first made against, served upon or received by the **Insured** or the applicable notice or order is filed or entered.

B. **Defense Costs** means that part of **Loss** consisting of:

   1. reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any **Insured**) incurred in: (a) investigating, defending, opposing or appealing any **Claim** or (b) any **Securityholder Derivative Demand Investigation**; and

   2. the premium for appeal, attachment or similar bonds (but the Insurer shall be under no obligation to furnish any bond).

C. **Insured** means any **Company** or **Insured Person**.

D. **Insured Person** means:

   1. an **Executive**;

QBE 000419

2. an **Employee**, but only with respect to a **Claim**: (a) brought by a securityholder of a **Company** in his capacity as such; or (b) that is also brought and maintained against an **Insured Person** included in paragraph 1 above; or

3. a holder of an equivalent position to those included in paragraph 1 above in an **Outside Entity**, while serving at the specific request or direction of the **Company**.

E. **Loss** means the amount that an **Insured** becomes legally obligated to pay on account of any **Claim** including:

1. compensatory damages;

2. judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorneys fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

3. pre and post-judgment interest;

4. **Defense Costs**;

5. solely with respect to Insuring Clause A, taxes imposed by law upon an **Insured Person** in his capacity as such in connection with any bankruptcy, receivership, conservatorship or liquidation of a **Company**, to the extent such taxes are insurable by law; and

6. punitive, exemplary or multiplied damages, fines or penalties, if and to the extent that any such damages, fines or penalties are insurable under the law of the jurisdiction most favorable to the insurability of such damages, fines or penalties.

In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant **Insureds** or to the **Claim** giving rise to such damages, fines or penalties, and the Insurer shall not challenge any opinion of independent legal counsel (mutually agreed to by the Insurer and the **Insured**) that such damages, fines or penalties are insurable under applicable law.

**Loss** does not include any portion of such amount that constitutes any:

(a) amount not insurable under the law pursuant to which this Coverage Part is construed;

(b) cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c) amount that represents or is substantially equivalent to an increase in consideration paid (or proposed to be paid) by a **Company** in connection with its purchase of any securities and assets;

(d) tax, other than taxes described in paragraph 5 above; or

(e) cost incurred to clean up, remove, contain, treat, detoxify or neutralize **Pollutants**.

F. **Outside Entity** means:

1. any non-profit entity, community chest, fund or foundation; or

2. any other entity specifically added as an **Outside Entity** by endorsement to this Coverage Part,

that is not a **Company**.

G. **Professional Services** means services which are performed for others for a fee.

H. **Securityholder Derivative Demand Investigation** means an investigation by a **Company** to determine whether it is in the best interest of such **Company** to prosecute the claims alleged in a securityholder derivative demand or lawsuit. Where a **Securityholder Derivative Demand Investigation** is initiated because of a lawsuit rather than a demand, any coverage provided for **Defense Costs** on account of such **Securityholder Derivative Demand Investigation** shall in no way limit the coverage otherwise afforded under this Coverage Part to an **Insured** for **Loss** on account of a **Claim**.

J. **Wrongful Act** means:

1. any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by: (a) an **Insured Person** in his capacity as such; or (b) by a **Company**; or

2. any other matter claimed against an **Insured Person** solely by reason of serving in his capacity as such.

QBE 000420

POLICY NUMBER: QPL0057435

QBBP-3007 (05-14)



***The Solution*** for Employment Practices Liability
Coverage Part Declarations

**QBE Insurance Corporation**

Wall Street Plaza, 88 Pine Street, New York, New York 10005
Home Office: c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

**THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

**Item 1**:    Parent Company:    Clyde Companies, Inc.

**Item 2**:    Limit of Liability

          $10,000,000 per Claim
          $10,000,000 in the aggregate

**Item 3**:    Retention: $100,000 per Claim

**Item 4**:    Pending or Prior Proceedings Date: August 21, 2005

QBE 000421



***The Solution*** for **Employment Practices Liability Coverage Part**

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the **Insureds** agree as follows:

## I.  INSURING CLAUSE

The Insurer shall pay, on behalf of an **Insured**, **Loss** on account of a **Claim** first made during the **Policy Period**.

## II.  EXCLUSIONS

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for **Loss** on account of that portion of a **Claim**:

A.  Breach of Written Employment Contract - based upon, arising out of or resulting from any breach of any written employment contract or agreement, provided that this Exclusion A shall not apply to: 1. **Loss** to the extent an **Insured** would have been liable for such **Loss** in the absence of such written employment contract or agreement; or 2. **Defense Costs**;

B.  OSHA, Workforce Notification and Labor Relations - based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by the Occupational Safety and Health Act, the Worker Adjustment and Retraining Notification Act, the National Labor Relations Act or any similar law; and

C.  Workers Compensation, Disability Benefits, Social Security, Unemployment - based upon, arising out of or resulting from any failure to comply with any obligation under any workers compensation, disability benefits, social security or unemployment insurance law;

Exclusions A - C above shall not apply to any **Claim** for **Retaliation**.

With respect to this Coverage Part, the following exceptions shall apply to Section II. EXCLUSIONS of the GTC:

1.  Exclusion A. Bodily Injury/Property Damage shall not apply to **Loss** for any mental anguish, emotional distress or humiliation when alleged as part of a **Claim** otherwise covered under this Coverage Part; and

2.  Exclusion C. ERISA and E. Pollution shall not apply to any **Claim** for **Retaliation**.

## III.  OTHER INSURANCE

A.  With respect to any **Claim** for an **Employment Practices Wrongful Act**, other than that portion of a **Claim** made against a leased or temporary employee or **Independent Contractor**, this Coverage Part shall be primary insurance.

B.  With respect to:

1.  that portion of any **Claim** made against any leased or temporary employee or **Independent Contractor**; or

2.  any **Claim** for a **Third Party Wrongful Act**, where **Loss** is covered under this Coverage Part and other valid and collective insurance,

this Coverage Part shall be specifically excess of and shall not contribute with any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by the Coverage Part), regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

## IV.  COORDINATION OF COVERAGE

Any **Loss** covered under this Coverage Part and one or more other **Liability Coverage Parts** shall first be covered under this Coverage Part, subject to its terms, conditions and limitations.  Any remaining portion of such **Loss** shall be covered under such other **Liability Coverage Part(s)**, subject to its terms, conditions and limitations.

## V.  GLOSSARY

A.  **Benefits** means any payments (including insurance premiums), deferred compensation, perquisites or fringe benefits, in connection with an employee benefit plan and any other payment to or for the benefit of an employee arising out of the employment relationship. However, **Benefits** shall not include salary, wages, bonuses, commissions, **Stock Benefits** or non-deferred cash incentive compensation.

QBE 000422

B.  **Claim** means any:

1.  written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, waiving or tolling of a statute of limitations, reinstatement, reemployment or re-engagement;

2.  civil or criminal proceeding, evidenced by: (a) the service of a complaint or similar pleading in a civil proceeding; or (b) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; and

3.  arbitration proceeding pursuant to an employment contract or agreement, policy or practice of a **Company**;

4.  administrative, regulatory or tribunal proceeding, other than a labor, grievance or other proceeding under a collective bargaining agreement, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation; or

5.  any audit of an **Insured** conducted by the United States of America Office of Federal Contract Compliance Programs ("OFCCP"),

against an **Insured** for a **Wrongful Act**, including any appeal therefrom.

The time when a **Claim** shall be deemed first made for the purposes of this Coverage Part shall be the date on which the **Claim** is first made against, served upon or received by the **Insured** or the applicable notice or order is filed or entered.

C.  **Defense Costs** means that part of **Loss** consisting of:

1.  reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any **Insured**) incurred in investigating, defending, opposing or appealing any **Claim**; or

2.  the premium for appeal, attachment or similar bonds (but the Insurer shall be under no obligation to furnish any bond).

D.  **Discrimination** means any violation of any employment discrimination law.

E.  **Employment Practices Wrongful Act** means any:

1.  breach of any employment contract or agreement or contractual obligation, including any contract or agreement or contractual obligation arising out of any employee handbook, personnel manual, policy statement or other representation;

2.  **Discrimination**;

3.  **Harassment**;

4.  **Retaliation**;

5.  **Workplace Tort**; or

6.  **Wrongful Employment Decision**,

committed, attempted, or allegedly committed or attempted by an **Insured** while acting in his or its capacity as such.

F.  **Harassment** means any:

1.  sexual harassment that is made a condition of employment with, used as a basis for employment decisions by, interferes with performance or creates an intimidating, hostile or offensive working environment within, a **Company**; or

2.  workplace harassment, including bullying that interferes with performance or creates an intimidating, hostile or offensive working environment within a **Company**.

G.  **Independent Contractor** means any natural person working for a **Company** pursuant to a written contract or agreement between such natural person and the **Company** which specifies the terms of the **Company's** engagement of such natural person.

H.  **Insured** means any **Company** or **Insured Person**.

I.  **Insured Person** means any:

1.  **Executive** or **Employee**; or

2.  **Independent Contractor**, but only if the **Company** agrees to indemnify the **Independent Contractor** in the same manner as **Employees** for liability arising out of a **Claim**.

QBE 000423

J. **Loss** means the amount that an **Insured** becomes legally obligated to pay on account of any **Claim** including:

1. compensatory damages (including back pay and front pay);

2. judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorney fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

3. pre and post-judgment interest;

4. liquidated damages awarded pursuant to the Age Discrimination in Employment Act, Family Medical Leave Act or Equal Pay Act;

5. **Defense Costs**; and

6. punitive, exemplary or multiplied damages, if and to the extent that any such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages.

In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant **Insureds**, to the **Company**, or to the **Claim** giving rise to such damages, and the Insurer shall not challenge any opinion of independent legal counsel (mutually agreed to by the Insurer and the **Insured**) that such damages are insurable under applicable law.

**Loss** does not include any portion of such amount that constitutes any:

(a) amount not insurable under the law pursuant to which this Coverage Part is construed;

(b) cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c) future salary, wages, commissions, or **Benefits** or other monetary payments of a claimant who has been or shall be hired, promoted or reinstated to employment pursuant to a settlement, order or other resolution of any **Claim**;

(d) salary, wages, commissions, **Benefits** or other monetary payments which constitute severance payments or payments pursuant to a notice period;

(e) **Benefits** due or to become due or the equivalent value of such **Benefits**;

(f) cost associated with providing any accommodation for persons with disabilities or any other status which is protected under any law, including the Americans with Disabilities Act and the Civil Rights Act of 1964;

(g) tax, fine or penalty imposed by law; or

(h) cost incurred to clean up, remove, contain, treat, detoxify or neutralize **Pollutants**.

K. **Retaliation** means retaliatory treatment against an **Employee** of a **Company** on account of such individual:

1. exercising his or her rights under law, refusing to violate any law or opposing any unlawful practice;

2. having assisted or testified in or cooperated with a proceeding or investigation (including any internal investigation conducted by the **Company's** human resources or legal department) regarding alleged violations of law by the **Insured**;

3. disclosing or threatening to disclose to a superior or any governmental agency any alleged violations of law; or

4. filing any claim against the **Company** under the Federal False Claims Act, Section 806 of the Sarbanes Oxley Act or any other whistleblower law.

L. **Stock Benefits** means any:

1. offering, plan or agreement between a **Company** and any **Employee** which grants stock, warrants, shares or stock options of the **Company** to such **Employee**, including grants of restricted stock, performance stock shares, membership shares or any other compensation or incentive granted in the form of securities of the **Company**; or

2. payment or instrument, the amount or value of which is derived from the value of securities of the **Company**, including stock appreciation rights or phantom stock plans or arrangements,

provided that **Stock Benefits** shall not include amounts claimed under any employee stock ownership plans or employee stock purchase plans.

QBE 000424

M. **Third Party** means any natural person who is not an **Insured Person**.

N. **Third Party Wrongful Act** means any sexual harassment, or discrimination based upon status protected under any anti-discrimination law, against a **Third Party** committed, attempted, or allegedly committed or attempted by any **Insured** while acting in his or its capacity as such.

O. **Workplace Tort** means any employment-related:

1. misrepresentation, defamation (including libel and slander), invasion of privacy, wrongful infliction of emotional distress, mental anguish or humiliation; or

2. negligent retention, supervision, hiring or training, failure to provide or enforce consistent employment-related corporate policies and procedures, false imprisonment, negligent evaluation, wrongful discipline or wrongful deprivation of career opportunity,

but only when alleged as part of a **Claim** for any **Wrongful Employment Decision**, breach of employment contract, **Discrimination**, **Harassment** or **Retaliation**.

P. **Wrongful Act** means an **Employment Practices Wrongful Act** or **Third Party Wrongful Act**.

Q. **Wrongful Employment Decision** means any wrongful termination, discharge of employment, demotion, denial of tenure, failure or refusal to employ or promote, or wrongful or negligent employee reference.

QBE 000425

**POLICY NUMBER: QPL0057435**

QBBP-3008 (05-14)

## ▲ QBE®

*The Solution* for Fiduciary Liability
Coverage Part Declarations

**QBE Insurance Corporation**

Wall Street Plaza, 88 Pine Street, New York, New York 10005
Home Office:  c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania  17101

**THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.  THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

**Item 1**:    Parent Company:        Clyde Companies, Inc.

**Item 2**:    A.  Limit of Liability

$10,000,000 per Claim
$10,000,000 in the aggregate

B.  Voluntary Compliance Program Loss Limit: $100,000

C.  ERISA Civil Penalties Limit: $100,000

D.  HIPAA Privacy Civil Penalties Limit: $100,000

**Item 3**:    Insuring Clause A Retention: $0 per Claim

**Item 4**:    Pending or Prior Proceedings Date: August 21, 2005

QBE 000426



*The Solution* for Fiduciary Liability
Coverage Part

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the **Insureds** agree as follows:

## I.    INSURING CLAUSE

A.  The Insurer shall pay, on behalf of an **Insured**, **Loss** on account of a **Claim** first made during the **Policy Period**.

B.  The Insurer shall pay, on behalf of an **Insured**, **Voluntary Compliance Program Loss** first ascertained by or assessed against an **Insured** during the **Policy Period**, provided that the payment of any **Voluntary Compliance Program Loss** under this Coverage Part shall not waive any of the Insurer's rights under this Policy.

## II.   EXCLUSIONS

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for **Loss** on account of that portion of a **Claim**:

A.  Liability Assumed Under Contract - based upon, arising out of or resulting from any liability of others assumed by an **Insured** under any contract or agreement, provided that this Exclusion A shall not apply to **Loss** to the extent that: 1. an **Insured** would have been liable for such **Loss** in the absence of such contract or agreement; or 2. the liability assumed was under the agreement or declaration trust pursuant to which a **Plan** was established; and

B.  Workers Compensation, Disability Benefits, Social Security, Unemployment - based upon, arising out of or resulting from any failure to comply with any obligation under any workers compensation, disability benefits, social security or unemployment insurance law, provided that this Exclusion B shall not apply to any **Wrongful Act** based upon, arising out of or resulting from: 1. COBRA; or 2. HIPAA;

With respect to this Coverage Part, the following exceptions shall apply to Section II. EXCLUSIONS of the GTC:

1.  Exclusion C. ERISA shall not apply to this Coverage Part; and

2.  Exclusion E. Pollution shall not apply to any **Claim**:

    (a)  brought by or on behalf of a participant in, or beneficiary of, any **Sponsored Plan** based upon, arising out of or resulting from the diminution in value of any securities owned by such **Sponsored Plan** in any organization, where such diminution in value is allegedly the result of the matters described in Exclusion E; and

    (b)  for which an **Insured Person** is not indemnified by a **Company** because of such **Company's Financial Impairment**.

## III.  RETENTION

No retention shall apply to any **Voluntary Compliance Program Loss** or **Loss** constituting civil penalties as described in paragraphs 7(b)(iii) and (iv) of the definition of **Loss**.

## IV.   LIMIT OF LIABILITY

A.  The Voluntary Compliance Program Loss Limit stated in Item 2B of the Declarations of this Coverage Part represents the Insurer's maximum liability for all **Voluntary Compliance Program Loss**, including **Defense Costs** related to the assessment or correction of a **Plan's** non-compliance with any **Voluntary Compliance Program**, payable under this Coverage Part during the **Policy Period**.

B.  The ERISA Civil Penalties Limit stated in Item 2C of the Declarations of this Coverage Part represents the Insurer's maximum liability for all civil penalties described in paragraph 7(b)(iii) of the definition of **Loss** ("ERISA Civil Penalties") payable under this Coverage Part during the **Policy Period**.

C.  The HIPAA Privacy Civil Penalties Limit stated in Item 2D of the Declarations of this Coverage Part represents the Insurer's maximum liability for all civil penalties described in paragraph 7(b)(iv) of the definition of **Loss** ("HIPAA Privacy Civil Penalties") payable under this Coverage Part during the **Policy Period**.

All amounts set forth above shall be part of, and not in addition to, the Limit of Liability set forth in Item 2A of the Declarations of this Coverage Part.

QBE 000427

## V.    REPORTING

The **Insured** shall notify the Insurer of **Voluntary Compliance Program Loss** as soon as practicable after such **Voluntary Compliance Program Loss** is first ascertained by or assessed against an **Insured**. However, in no event shall any notice be provided later than:

A.  if this Coverage Part expires (or is otherwise terminated) without being renewed with the Insurer, 60 days after the effective date of expiration or termination of this Coverage Part; or

B.  the expiration date of the ERP, if applicable.

## VI.    OTHER INSURANCE

With the exception of insurance which is written specifically as excess of the Limit of Liability of this Coverage Part, this Coverage Part shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for **Loss** for which this Coverage Part provides coverage, provided that any payment by an **Insured** of a retention or deductible under any such other insurance shall reduce the Retention under this Coverage Part by the amount of such payment which would otherwise have been **Loss** under this Coverage Part.

## VII.    PRIORITY OF PAYMENTS

In the event a liquidation or reorganization proceeding is commenced by or against a **Company** pursuant to United States bankruptcy law, the Insurer shall first pay **Loss** incurred by an **Insured Person** and the **Plans** and then pay **Loss** incurred by any **Company**.

## VIII.    CHANGES IN A PLAN

A.  If the Pension Benefit Guaranty Corporation ("PBGC") becomes the trustee of a **Plan** before or after the inception date of this Coverage Part, coverage for such **Plan** shall continue until termination of this Coverage Part for those who were **Insureds** at the time the PBGC became the trustee, but only with respect to **Wrongful Acts** which occurred prior to the effective date the PBGC became the trustee; or

B.  If a **Company** terminates a **Plan** before or after the inception date of this Coverage Part, coverage for such **Plan** shall continue until termination of this Coverage Part for those who were **Insureds** at the time of such **Plan** termination or who would have been an **Insured** at the time of such termination if this Coverage Part had been in effect, but only with respect to **Wrongful Acts** which occurred prior to or after the date the **Plan** was terminated.

## IX.    GLOSSARY

A.  **Administration** means advising, counseling, interpreting, providing notice to or handling of records, enrollment, termination or cancellation of, any **Plan** for **Employees**, **Executives**, participants or beneficiaries.

B.  **Claim** means any:

  1.  written notice of commencement of a fact finding investigation by the U.S. Department of Labor ("DOL"), the PBGC or any similar governmental authority located outside of the United States;

  2.  written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, mediation or waiving or tolling of a statute of limitations or **Extradition**;

  3.  civil or criminal proceeding, evidenced by: (a) the service of a complaint or similar pleading in a civil proceeding; or (b) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; or

  4.  formal administrative or regulatory proceeding, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation,

against an **Insured** for a **Wrongful Act**, including any appeal therefrom.

The time when a **Claim** shall be deemed first made for the purposes of this Coverage Part shall be the date on which the **Claim** is first made against, served upon or received by the **Insured**.

C.  **Defense Costs** means that part of **Loss** consisting of:

  1.  reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any **Insured**) incurred in investigating, defending, opposing or appealing any **Claim** or **Voluntary Compliance Program Loss**; or

QBE 000428

2. the premium for appeal, attachment or similar bonds (but the Insurer shall be under no obligation to furnish any bond).

D. **Insured** means any **Company**, **Plan** or **Insured Person**.

E. **Insured Person** means any:

1. **Executive** of a **Company**;

2. **Employee** of a **Company** or **Sponsored Plan**; and

3. past, present or future natural person trustee of a **Sponsored Plan**.

F. **Loss** means the amount that an **Insured** becomes legally obligated to pay on account of any **Claim** including:

1. compensatory damages;

2. judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorneys fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

3. pre and post-judgment interest;

4. **Defense Costs**;

5. **Voluntary Compliance Program Loss**;

6. punitive, exemplary or multiplied damages, if and to the extent that any such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages; and

7. the following civil penalties:

(a) the 5% or less, or 20% or less, civil penalties imposed upon an **Insured** as a fiduciary under § 502(i) or (l) of **E R I S A**;

(b) civil penalties imposed:

(i) by the Pension Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions, the United Kingdom Occupational Pensions Regulatory Authority or the Pensions Regulator, pursuant to the Pension Scheme Act of 1993, the Pensions Act of 1995 and the Pensions Act of 2004; or

(ii) by Ireland's Pensions Board or Pensions Ombudsman,

provided that any coverage for such civil penalties applies only if the funds or assets of the pension scheme are not used to fund, pay or reimburse the premium for this Coverage Part;

(iii) upon an **Insured** as a fiduciary under Section 502(c) of **ERISA**; or

(iv) upon an **Insured** for violation of the privacy provisions of HIPAA.

In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant **Insureds** or to the **Claim** giving rise to such damages, and the Insurer shall not challenge any opinion of independent legal counsel (mutually agreed to by the Insurer and the **Insured**) that such damages are insurable under applicable law.

**Loss** does not include any portion of such amount that constitutes any:

(a) amount not insurable under the law pursuant to which this Coverage Part is construed;

(b) cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c) tax imposed by law;

(d) fine or penalty imposed by law, other than as described in paragraph 7 above;

(e) benefits due or would become due under any **Plan**, including the payment of plaintiffs' attorneys fees as a percentage of such benefits or from a common fund established to pay such benefits, unless:

(i) such benefits are payable as an **Insured Person's** personal obligation based upon, arising out of or

QBE 000429

resulting from a **Wrongful Act**; or

    (ii)  a **Claim** alleges a loss to the **Plan** or to the accounts of such **Plan's** participants resulting from a change in the value of **Plan** investments, even where the amounts sought or recovered by the plaintiffs in such **Claim** are described in any way as "benefits"; or

  (f)  cost incurred to clean up, remove, contain, treat, detoxify or neutralize **Pollutants**.

G.  **Plan** means:

    1.  any **Sponsored Plan**; and

    2.  any government mandated workers compensation, disability benefits, social security or unemployment insurance for **Employees** and **Executives**.

H.  **Sponsored Plan** means:

    1.  any employee benefit plan, pension benefit plan or welfare benefit plan, as defined in and subject to **ERISA**, including any **VEBA**, which is operated by a **Company** or a **Company** and a labor organization solely for the benefit of **Employees** or **Executives** of a **Company**; or

    2.  any other employee benefit plan or program similar to those described in paragraph 1, but which is not subject to **ERISA,** including any fringe benefit or excess benefit plan,

provided that **Sponsored Plan** shall not include any employee stock ownership plan created after inception of the **Policy Period**.

I.  **VEBA** means any Voluntary Employees' Beneficiary Associations as defined in Section 501(c)(9) of the Internal Revenue Code of 1986.

J.  **Voluntary Compliance Program** means any voluntary compliance resolution program or similar voluntary settlement program administered by the Internal Revenue Service or DOL or any other domestic or foreign governmental authority. Such programs include the Employee Plans Compliance Resolution System, Audit Closing Agreement Program, Voluntary Compliance Resolution Program, Wa k-in Closing Agreement Program, Administrative Policy Regarding Self-Correction, Tax Sheltered Annuity Voluntary Correspondence Program, Delinquent Filer Voluntary Compliance Program and Voluntary Fiduciary Correction Program.

K.  **Voluntary Compliance Program Loss** means fees, fines, penalties or sanctions paid by an **Insured** to a governmental authority under a **Voluntary Compliance Program** for a **Plan's** inadvertent non-compliance with any l a w . However, **Voluntary Compliance Program Loss** shall not include any costs to correct any non-compliance.

L.  **Wrongful Act** means any:

    1.  actual or alleged breach of the responsibilities, obligations or duties imposed by **ERISA** upon fiduciaries of the **Sponsored Plan**;

    2.  negligent act, error or omission in the **Administration** of any **Plan** committed, attempted or allegedly committed or attempted by an **Insured** in his or its capacity as such;

    3.  other matter claimed against an **Insured Person** solely by reason of the **Insured Person's** serving as a fiduciary of a **Sponsored Plan**; or

    4.  negligent act, error or omission committed, attempted or allegedly committed or attempted by an **Insured Person** in performing any functions identified in ERISA Section 3(21)(A) as not being the functions of a fiduciary, and commonly referred to as "settlor" functions

**POLICY NUMBER: QPL0057435**
**Endorsement Effective Date: August 21, 2017**                                    QBBPP-2103 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## STATE AMENDATORY INCONSISTENCY ENDORSEMENT

This endorsement modifies insurance provided under the following:

GENERAL TERMS AND CONDITIONS

It is hereby agreed that in the event there is an inconsistency between a state amendatory endorsement attached to this Policy and any other term or condition of this Policy, then where permitted by law, the Insurer shall apply those terms and conditions of either the state amendatory endorsement or the Policy, whichever are more favorable to the **Insured**.

All other terms and conditions of this Policy remain unchanged.

QBE 000431

**POLICY NUMBER:** QPL0057435
**Endorsement Effective Date: August 21, 2017**                                                    **QBBP-5120 (05-14)**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## UTAH AMENDATORY ENDORSEMENT

It is hereby agreed that:

I.    Section **XIII. TERMINATION OF POLICY** is amended by the addition of the following:

The Insurer will deliver or mail, by first-class mail, written notice of cancellation to the **Parent Company** at the address set forth in the Declarations of the GTC.  The notice shall state the reason for cancellation.

II.   Section **XV. EFFECT OF BANKRUPTCY** is amended by the addition of the following:

If execution against the **Insureds** is returned unsatisfied, an action may be maintained against the Insurer to the extent that such liability is covered under this Policy.

III.  This Policy is amended by the addition of the following:

**NON-RENEWAL**

If the Insurer decides not to renew this Policy, then the Insurer will deliver or mail, by first-class mail, written notice of non-renewal to the **Parent Company** at the address set forth in the Declarations of the GTC at least thirty (30) days before the expiration date of the Policy.   The notice shall state the reason for non-renewal.

**RENEWAL**

If the Insurer offers to renew the Policy, the Insurer will deliver or mail, by first-class mail, written notice to the **Parent Company** at the address set forth in the Declarations of the GTC not more than forty-five (45) days nor less than fourteen (14) days prior to the due date of the renewal premium.  The notice will state the renewal premium, how the renewal premium may be paid, and a statement providing that the failure to pay the renewal premium by the due date extinguishes the **Parent Company's** right to renewal.

If the Insurer offers to renew the Policy on less favorable terms or at higher rates, then the Insurer will deliver or mail, by first-class mail, written notice to the **Parent Company** at the address set forth in the Declarations of the GTC at least thirty (30) days before the expiration date of the Policy.  The notice will provide the new terms or rates for the renewal Policy.   If the Insurer fails to provide notice of the new terms or rates at least thirty (30) days prior to the expiration date, the new terms or rates shall not take effect until thirty (30) days after the notice is delivered or sent by first-class mail, in which case the **Parent Company** may elect to cancel the renewal Policy at any time during the thirty (30) day period.  Return premiums or additional premium charges shall be calculated proportionately based on the existing Policy's rates.

All other terms and conditions of this Policy remain unchanged.

QBE 000432

**POLICY NUMBER: QPL0057435**
**Endorsement Effective Date: August 21, 2017**                                          **QBBP-5122 (05-14)**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**UTAH AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART


It is hereby agreed that the definition of **Loss** in paragraph E.6. of Section **X. GLOSSARY** is amended by the addition of the following:

Provided, however, that punitive damages are not insurable in the event this Coverage Part is construed by a court of competent jurisdiction under the laws of the state of Utah.


All other terms and conditions of this Policy remain unchanged.

QBE 000433

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**UTAH AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that the definition of **Loss** in paragraph J.6. of Section **V. GLOSSARY** is amended by the addition of the following:

Provided, however, that punitive damages are not insurable in the event this Coverage Part is construed by a court of competent jurisdiction under the laws of the state of Utah.

All other terms and conditions of this Policy remain unchanged.

QBE 000434

**POLICY NUMBER: QPL0057435**
**Endorsement Effective Date: August 21, 2017**                    QBBP-5118 (05-14)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**UTAH AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

FIDUCIARY LIABILITY COVERAGE PART

It is hereby agreed that the definition of **Loss** in paragraph F.6. of Section **IX. GLOSSARY** is amended by the addition of the following:

Provided, however, that punitive damages are not insurable in the event this Coverage Part is construed by a court of competent jurisdiction under the laws of the state of Utah.

All other terms and conditions of this Policy remain unchanged.

QBE 000435

**POLICY NUMBER: QPL0057435**
**Endorsement Effective Date: August 21, 2017**                                    QBBPP-2223 (10-14)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMEND DEFINITION OF INSURED PERSON ENDORSEMENT**

This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that the definition of **Insured Person** in paragraph D. of Section **X. GLOSSARY** is replaced by the following:

D.  **Insured Person** means:

   1. an **Executive**;

   2. an **Employee**; or

   3. a holder of an equivalent position to those included in paragraph 1 above in an **Outside Entity**, while serving at the specific request or direction of the **Company**.

All other terms and conditions of this Policy remain unchanged.

QBE 000436

**POLICY NUMBER: QPL0057435**
**Endorsement Effective Date: August 21, 2017**                                        QBBPP-2213 (09-14)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PROFESSIONAL SERVICES EXCLUSION WITH SECURITYHOLDER CLAIM CARVEBACK

This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that Exclusion H. Professional Services in Section **II. EXCLUSIONS** is amended by the addition of the following:

Exclusion H shall not apply to any **Claim** brought by a securityholder of a **Company** against a **Company**. However, in no event shall any coverage be provided for any portion of such **Claim** that is brought by the securityholder in solely his capacity as a client of such **Company**.

All other terms and conditions of this Policy remain unchanged.

**POLICY NUMBER: QPL0057435**

**Endorsement Effective Date: August 21, 2017**                                    **QBBPP-2200 (05-14)**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMEND DEFINITION OF CLAIM TO INCLUDE MEDIATION**

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that Section **V. GLOSSARY**, paragraph B. **Claim** 1. is amended by the addition of the word "mediation," after the word "arbitration,".

All other terms and conditions of this Policy remain unchanged.

QBE 000438

POLICY NUMBER: QPL0057435
Endorsement Effective Date: August 21, 2017                                    QBBPP-2219 (10-14)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**EQUAL PAY ACT CARVEBACK  ENDORSEMENT**

This endorsement modifies insurance provided under the following:
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that Exclusion G. Wage and Hour in Section II. EXCLUSIONS of the GTC shall not apply to any **Claim** for any violation of the responsibilities, obligations or duties imposed by the Equal Pay Act.

All other terms and conditions of this Policy remain unchanged.

QBE 000439

**POLICY NUMBER: QPL0057435**
**Endorsement Effective Date: August 21, 2017**                                    QBBPP-2225 (10-14)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMEND DEFINITION OF RETALIATION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that the definition of **Retaliation** in paragraph K. of Section **V. GLOSSARY** is amended by deleting the word "**Employee**" and replacing it with the word "**Insured Person**".

All other terms and conditions of this Policy remain unchanged.

QBE 000440

POLICY NUMBER: QPL0057435
Endorsement Effective Date: August 21, 2017

QBBPP-2158 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PPACA AND PPA CIVIL PENALTIES ENDORSEMENT

This endorsement modifies insurance provided under the following:

FIDUCIARY LIABILITY COVERAGE PART

It is hereby agreed that:

**I.**  Section **III. RETENTION** is amended by the addition of the following:

No retention shall apply to **Loss** constituting civil penalties imposed upon an **Insured** for inadvertent violation of the Patient Protection and Affordable Care Act ("PPACA") or the Pension Protection Act of 2006 ("PPA").

**II.**  Section **IV. LIMIT OF LIABILITY** is amended by the addition of the following:

All **Loss** arising from **Claims** alleging inadvertent violations of PPACA or the PPA shall be subject to a sublimit of liability of $50,000, which amount shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of this Coverage Part.

**III.**  The definition of **Loss** in paragraph F.7. of Section **IX. GLOSSARY** is amended by the addition of the following:

any civil penalties imposed upon an **Insured** for inadvertent violation of PPACA or the PPA.

All other terms and conditions of this Policy remain unchanged.

QBE 000441

**POLICY NUMBER: QPL0057435**
**Effective Date of Endorsement: August 21, 2017**                                                      **QBBPP-2097 (05-14)**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### SPECIFIC LITIGATION EXCLUSION

This endorsement modifies insurance provided under the following:

GENERAL TERMS AND CONDITIONS

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

FIDUCIARY LIABILITY COVERAGE PART

It is hereby agreed that Section **II. EXCLUSIONS** is amended by the addition of the following:

No coverage shall be provided for any **Loss** in connection with any **Claim** made against any **Insured** based upon, arising out of or resulting from any notice, litigation, investigation, prosecution, adjudication, or proceeding described below ("Litigation").

David Slack et al / claim #100-25-570 / claim date 8/21/2013

All other terms and conditions of this Policy remain unchanged.

**QBBPP-2097 (05-14)**                                                                                 **Page 1 of 1**

QBE 000442

**POLICY NUMBER: QPL0057435**
**Endorsement Effective Date: August 21, 2017**                                    QBPD-6000 (02-15)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

It is hereby agreed that:

**I.**  This Policy is amended by the addition of the following:

If aggregate insured losses attributable to a **Certified Act of Terrorism** under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**II.**  Solely for the purposes of this endorsement, this Policy is amended by the addition of the following:

**Certified Act of Terrorism** means an act that is certified by the Secretary of Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act,, to be an act of terrorism.  The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:
1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and
2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**III.**  The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any **Loss** that is otherwise excluded under this Policy.

All other terms and conditions of this Policy remain unchanged.

QBE 000443